## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) ) ) |
| Defendant. | ) |

Civil Case No. 20-00844 (RJL)

## MEMORANDUM OPINION
(March 16, 2021) [Dkt. #4, #8]

This case presents a labor dispute over the right to perform certain safety-related work along railroad tracks.  Plaintiff Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED") seeks a declaratory judgment against defendant National Railroad Passenger Corporation ("Amtrak") stating that Amtrak violates the Railway Labor Act ("RLA"), 45 U.S.C. § 152 Seventh, by allowing outside contractors to perform certain "flagging" work, which, BMWED asserts, is reserved to "BMWED-represented Amtrak employees" under the parties' collective bargaining agreement ("CBA").  *See* Compl. [Dkt. #1] at 1, 6–7.  Amtrak disagrees with BMWED's interpretation of the CBA but moves to dismiss on jurisdictional grounds, arguing that regardless of the correct contract interpretation, this is a "minor dispute" subject to compulsory arbitration under the RLA.  *See* Def.'s Mot. to Dismiss ("Def.'s MTD") [Dkt. #4-1] at 6.

1

Presently before the Court are Amtrak's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) [Dkt. #4] and BMWED's Motion for Summary Judgment [Dkt. #8]. Because I agree with Amtrak that its interpretation of the CBA is at least "arguably justified," I have concluded this is a minor dispute under the RLA and must therefore be submitted to arbitration. *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 307 (1989) (hereinafter "*Conrail*"). Accordingly, for the following reasons, defendant's motion to dismiss is GRANTED, plaintiff's motion for summary judgment is DENIED, and plaintiff's complaint is DISMISSED.

## BACKGROUND

### A. The Parties' Agreement

Amtrak is a government-subsidized passenger rail carrier subject to the RLA. Compl. ¶ 2. BMWED is a labor union representing Amtrak maintenance of way employees, who are generally responsible for constructing, repairing, and maintaining Amtrak's track as well as bridges, tunnels, and related structures. *Id.* ¶ 1.

Amtrak and BMWED are parties to the CBA, which governs the rates of pay, rules, and working conditions for maintenance of way employees working on Amtrak's Northeast Corridor ("NEC"). *Id.* ¶ 6. The "Scope Rule" of the CBA, as amended in 1987, defines the scope of maintenance of way work as,

> work, such as, inspection, construction, repairs and maintenance of water facilities, bridges, culverts, buildings and other structures, tracks, fences and roadbed, including catenary system, third rail, substations and transmission in connection with electric train operation, and work which as of June 1, 1945, was being performed by these employees, such as station lighting, power lines, floodlights, on elevators and drawbridges . . . .

Ex. A to Decl. of Aaron Buck ("Buck Decl.") [Dkt. #4-2] at 11.

The CBA further provides that "[i]n the event [Amtrak] plans to contract out work within the scope [of maintenance of way work]," it must notify BMWED. *Id.* The CBA then details certain additional restrictions on, and procedures for, contracting out such work. *Id.* at 11–12.

A side letter to the CBA ("the Side Letter"), dated January 22, 1987, states that "it is the Carrier's intent to preserve work of the scope and magnitude historically performed by members of the BMWE for the Carrier as of January 1, 1987, or prior thereto."[1]  Compl. ¶ 9; Def.'s MTD at 3.

## B. The Present Dispute

The present dispute arises out of BMWED's concern that Amtrak will allow outside contractors to perform certain "flagging" work along the NEC.  Generally speaking, flagging work involves the "protection of workers and equipment on the tracks and in the railroad right of way . . . from oncoming trains and other equipment."  Decl. of Anthony Sessa ("Sessa Decl.") [Dkt. #8-3] ¶ 8.

This work is necessary for the protection of workers and is required in order to comply with federal regulations. *See generally* 49 C.F.R. Part 214, Subpart C.  As particularly relevant here, Federal Railroad Administration regulations require that when work is done on or near live tracks, a Roadway Worker in Charge ("RWIC") must be present and undertake various responsibilities designed to ensure the safety of the

---

[1]  Here, "the Carrier" refers to Amtrak and "BMWE" refers to BMWED's predecessor organization, the Brotherhood of Maintenance of Way Employes.  Compl. ¶ 1.

workers involved. *See* Sessa Decl. ¶ 8; *see also* 49 C.F.R. § 214.321. The RWIC must

be qualified in railway worker protection and, among other things, verify that workers are

aware of applicable safety rules, coordinate with train dispatchers, and ensure people and

equipment are in a safe position prior to the passage of any train. *See* Sessa Decl. ¶ 8;

Buck Decl. ¶ 6–7.

In February and March 2020, BMWED learned that Amtrak was training

employees of an outside contractor, RailPros, on track protection rules and procedures so

that RailPros employees could act as RWICs. Compl. ¶ 12. According to Amtrak's

Senior Director Labor Relations, RailPros sought this training because it hoped to

provide flagging protection to third parties when those entities performed work on or near

Amtrak tracks such that compliance with the federal safety regulations is required.

*Id.* ¶ 14. After receiving training, RailPros began advertising positions described as

"Roadway Worker In Charge" at several locations along the NEC. *Id.* ¶ 12.

BMWED took issue with an outside contractor such as RailPros performing work

it viewed as reserved to its members. Accordingly, it wrote to Amtrak, stating that

"under the CBA, performance of all on-track protection on Amtrak's property, and

performance of such work for third party projects and for third parties engaged in non-

railroad work near Amtrak's track structure such that Amtrak operating and roadway

worker rules apply, is reserved to BMWED forces." *Id.* ¶ 15. It further asserted that

"this work has been performed exclusively by BMWED members since the inception of

Amtrak" and that if Amtrak permitted anyone other than BMWED-represented Amtrak

employees to perform such flagging work, it would "constitute a unilateral change of the

CBA."[2]  *Id.*

Amtrak responded with a letter contesting BMWED's interpretation.  To Amtrak, at least where the underlying work for which flagging was required was "not controlled or instigated by Amtrak" and was "not for the exclusive benefit of the railroad," and where Amtrak was not hiring the vendor providing the flagging work, any flagging work fell outside the scope of the CBA.  *See* Ex. D to Buck Decl.  Amtrak also contested BMWED's allegation of a "unilateral change," arguing instead that the dispute was "a matter of contract interpretation . . . and so must be resolved through arbitration under Section 153 of the RLA."  *Id.*

BMWED subsequently filed the instant complaint alleging that "by allowing a contractor and contractor forces to perform flagging work on or near Amtrak property where Amtrak operating and roadway worker rules apply, and to access to [sic] Amtrak property to provide on track protection where Amtrak operating and roadway worker rules apply, Amtrak is effectively rejecting, abrogating, and changing its agreements with BMWED . . . in violation of Section 2, Seventh of the RLA."  Compl. ¶ 22.  Amtrak moved to dismiss for lack of subject-matter jurisdiction in light of the mandatory arbitration provisions of the RLA, *see* 45 U.S.C. § 153 First (i).  Def.'s MTD at 1. BMWED then moved for summary judgment on the basis that it had definitively shown that the CBA reserves flagging work—including work performed for third parties that neither inures to Amtrak's benefit or is performed under Amtrak's control—for its

---

[2]   Under the RLA, a "unilateral change" is a term of art specifically implicating a violation of 45 U.S.C. § 152 Seventh, which prohibits any carrier from "chang[ing] the rates of pay, rules, or working conditions of its employees" except in the manner prescribed by the RLA.  45 U.S.C. § 152 Seventh.

members.  *See* Pl.'s Mem. of Law in Opp'n to Def.'s MTD, and in Support of Pl.'s Mot.

for Sum. Judgment ("Pl.'s MSJ") [Dkt. #8-2] at 1–2.  Both motions are now ripe and

resolved herein.

## STANDARD OF REVIEW

Federal courts possess only limited jurisdiction.  *Kokkonen v. Guardian Life Ins.*

*Co. of Am.*, 511 U.S. 375, 377 (1994).  When, as here, a party moves to dismiss under

Federal Rule of Civil Procedure 12(b)(1), the Court must "determine whether it has

subject matter jurisdiction in the first instance."  *Taylor v. Clark*, 821 F. Supp. 2d 370,

372 (D.D.C. 2011).  Where the Court lacks jurisdiction, it is powerless to provide

plaintiff any relief.  *Bhd. of Maint. of Way Employes Div./IBT v. Nat. R.R. Passenger*

*Corp.*, 217 F. Supp. 3d 249, 256 (D.D.C. 2016) (hereinafter "*BMWED*").

Under Rule 12(b)(1), plaintiff bears the burden of proving the Court has

subject-matter jurisdiction.  *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d

172, 176 (D.D.C. 2004).  The Court must accept as true all well pleaded factual

allegations and draw all reasonable inferences in plaintiff's favor.  *Am. Farm Bureau v.*

*E.P.A.*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).  But "the Court may give the plaintiff's

factual allegations closer scrutiny" than it would in assessing a motion under Rule

12(b)(6), and the Court may consider materials outside of the pleadings.  *Logan v. Dep't*

*of Veteran Affairs*, 357 F. Supp. 2d 149, 153 (D.D.C. 2004).

## ANALYSIS

Congress has restricted the subject-matter jurisdiction of federal district courts to

hear claims under the RLA.  *See, e.g.*, 45 U.S.C. § 153 First (establishing the National Railroad Adjustment Board (the "Board") and channeling disputes over the interpretation and application of railway labor agreements to arbitration before it).  District courts retain jurisdiction over so-called "major disputes" but lack the ability to hear "minor disputes" in the first instance.  *BMWED*, 217 F. Supp. 3d at 255.  Thus, the principal question before the Court is whether the parties' contract dispute is "major" or "minor."

The Supreme Court has adopted the major/minor distinction as a "shorthand method [for] describing two classes of controvers[ies]."  *Conrail*, 491 U.S. at 302.  Major disputes arise under Section 2 Seventh and Section 6 of the RLA.  *See* 45 U.S.C § 152 Seventh and § 156.  These involve "disputes over the formation of collective agreements or efforts to secure them . . . not [the] assertion of rights claimed to have vested in the past."  *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also Conrail*, 491 U.S. at 303.  Under the RLA, major disputes require a "lengthy process of bargaining and mediation," and federal courts have subject-matter jurisdiction to issue injunctions in order to preserve the status quo pending completion of the necessary procedures.  *Conrail*, 491 U.S. at 303.

Minor disputes, by contrast, arise under Section 2 Sixth and Section 3 First (i) of the RLA.  45 U.S.C. § 152 Sixth and § 153 First (i).  These controversies "relate[] . . . to the meaning or proper application of a particular [contractual] provision with reference to a specific situation or to an omitted case."  *Conrail*, 491 U.S. at 303 (quoting *Burley*, 325 U.S. at 723).  The claim in minor disputes is "to rights accrued" not merely an argument "to have new [rights] created for the future."  *Id.* (quoting *Burley*, 325 U.S. at 723).

Under the RLA, such disputes are subject to compulsory and binding arbitration before

the Board, and federal courts lack subject-matter jurisdiction to hear the claim in the first

instance. *See id*. at 310 (holding "courts must defer to the arbitral jurisdiction of the

Board" to resolve minor disputes).

In *Conrail*, the Supreme Court elaborated on the distinction between major and

minor disputes by clarifying that,

> [T]he line drawn in *Burley* looks to whether a claim has been made that the
> terms of an existing agreement either establish or refute the presence of a
> right to take the disputed action. The distinguishing feature of such a [minor]
> case is that the dispute may be conclusively resolved by interpreting the
> existing agreement.

*Id.* at 305 (internal citations omitted).

Thus, disputes focusing on contractual interpretation will generally constitute

minor disputes. But to avoid enabling one party to obtain mandatory binding arbitration

simply by framing a dispute as one of contractual interpretation, the Supreme Court has

held that a dispute is minor only where "the [contested] action is arguably justified by the

terms of the parties' collective-bargaining agreement." *Id.* at 307. "Where, in contrast,

the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.*

The employer bears a "relatively light burden" under this standard. *Id.* Indeed,

there is "a strong presumption in favor of finding a dispute to be minor" and if "doubt

arises about the classification of a dispute, the dispute is . . . considered to be minor."

*BMWED*, 217 F. Supp. 3d at 256 (quoting *Oakey v. U.S. Airways Pilots Disability*

*Income Plan*, 839 F. Supp. 2d 225, 231 (D.D.C. 2012) and *Bhd. of Maint. of Way Empls.*

*v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001)).

To resolve the question of whether a dispute is major or minor, the Court must analyze the parties' contractual arguments to determine whether they are arguably justified.[3] *BMWED*, 217 F. Supp. 3d at 258.  In making this assessment, the Court relies not only on the traditional tools of contract interpretation but may also consider other sources such as the "practice, usage, and custom" of the parties and "the common law of a particular industry." *Conrail*, 491 U.S. at 311–12 (noting that a "collective bargaining agreement is not an ordinary contract . . . [but] is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate").

Here, BMWED argues that the parties' dispute is major because the terms of the CBA reserve flagging work for BMWED-represented employees to the exclusion of third-party vendors. Pl.'s MSJ at 13.  Specifically, BMWED contends that because its forces have historically "provided protection for workers and equipment on Amtrak track and right of way . . . for Amtrak, and for contractors," the Side Letter[4] applies and insulates all such work from being contracted out to other parties. *Id.*  In support, BMWED provides declarations purporting to show "a consistent, longstanding practice" dating back to 1979 of BMWED "perform[ing] flagging work even when other work is contracted-out, and even when the work is not on the right of way and is at the behest of

---

[3] In taking a "peek" at the merits, *see BMWED*, 217 F. Supp. 3d at 258, the Court remains mindful that ultimate authority over contract interpretation in the context of railway labor disputes is reserved to the Board. *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518,1524 (D.C. Cir. 1989) (hereinafter "*ALPA*") ("It is the role of the arbitrator, not the court, to choose between the parties' interpretations of the Agreement.").

[4] Both parties contend the Side Letter's terms are relevant in interpreting the Scope Rule in the CBA. Pl.'s MSJ at 13; Def.'s MTD at 9.  Accordingly, the Court treats the Side Letter as constituting part of the parties' agreement. *See S.E. Pennsylvania Transp. Auth. v. Bhd. of R.R. Signalmen*, 882 F.2d 778, 783 (3d Cir. 1989) (noting the permissibility of relying on side letter agreements in interpreting collective bargaining agreements under the RLA).

entities other than Amtrak." *Id.* at 14; *see also* Sessa Decl.; Decl. of Jed Dodd ("Dodd Decl.") [Dkt. #8-4].

Amtrak, on the other hand, contends the dispute is minor because "it is at least arguable that the Scope Clause does not apply when a flagging contractor is retained by a third party to do work that is not for the benefit of Amtrak." Def.'s MTD at 9.  Amtrak rejects BMWED's interpretation of the Side Letter, arguing instead that, under the terms of the Side Letter, work must have been historically performed exclusively by BMWED-represented employees to be covered under the Scope Rule. *Id.*  Since that is not the case here, Amtrak contends that it is at least arguable that the flagging work in question is not reserved to BMWED forces. *Id.*; *see also* Buck Decl.; Decl. of Andrew Keefe ("Keefe Decl.") [Dkt. #12-2]. [5]

Additionally, Amtrak relies on numerous arbitration awards in which the Board found that where work is not performed at the carrier's instigation, under its control, at its expense, or exclusively for its benefit, contracting out said work does not run afoul of the applicable scope rule in other collective bargaining agreements.  Def.'s MTD at 10.  For the following reasons, I agree with Amtrak that this is indeed a minor dispute.

### 1. The Parties' Agreement

The text of the parties' agreement favors Amtrak.  The Scope Rule in the CBA itself is silent regarding flagging work.  Accordingly, both parties rely on the text of the

---

[5] Amtrak also points to the "for the Carrier" language in the Side Letter, contending that this excludes work performed by third parties that is outside of Amtrak's direction or control and is not for Amtrak's benefit from being covered under the Scope Rule. *See* Def.'s MTD at 10; Def.'s Reply in Support of Motion to Dismiss ("Def.'s Reply") [Dkt. #12] at 7–8.

Side Letter as controlling.  Def.'s MTD at 9; Pl.'s MSJ at 13.  The Side Letter expresses

Amtrak's "intent to preserve work of the scope and magnitude historically performed by

members of BMWE for the Carrier as of Jan. 1, 1987, or prior thereto."  Compl. ¶ 9.

This supports Amtrak's proposed reading.  How so?

It is at least arguable that the plain meaning of the term "historically performed"

requires work to have been performed *exclusively* by BMWED employees.  *See* Def.'s

MTD at 9.  Indeed, BMWED does not meaningfully oppose this interpretation as one

potential reading of the Side Letter.[6]  Instead, it argues that its showing as to historical

practice is sufficient to obtain summary judgment.  Pl.'s MSJ at 15–16 (contending

BMWED "has shown that its members, and not contractor forces, have provided flagging

for contractors working on or near the NEC right of way, including when contractors

were working for third parties").  But this ignores the fact dispute created by the parties'

dueling declarations as to who actually performed flagging work for third-parties along

the NEC in the past.  *Compare* Buck Decl. ¶ 14 (stating "BMWED employees have never

exclusively provided flagging for third parties"); *and* Keefe Decl. ¶ 4–15 (rejecting

contention that BMWED exclusively performed flagging work on the NEC and providing

examples of other entities who provide flagging work); *with* Sessa Decl. ¶ 9–10 (stating

that both prior to and after January 1, 1987, BMWED-represented employees performed

flagging work "for both Amtrak employees and contractor work forces") *and* Dodd Decl.

¶ 5 ("During my entire tenure . . . flagging work on the Northeast Corridor . . . was

---

[6] BMWED does make generalized statements that the parties' "agreement is not conditional, or contingent."  Pl.'s MSJ at 14.  To the extent these statements are intended to suggest that Amtrak's proposed interpretation is frivolous or obviously insubstantial, the Court disagrees.

performed by BMWED represented employees, and not by contractor flaggers.").

The Court need not, and should not, resolve this dispute here. *See, e.g.*, *Sheet Metal Workers Int'l Ass'n v. Kan. City S. Ry.*, No. 09-00091, 2009 WL 3756440, at *4 (W.D. Mo. Nov. 9, 2009) (refusing to resolve factual issue regarding parties' working relationship in holding dispute was minor). It is enough to conclude that BMWED fails to definitively show that it has exclusively performed the flagging work it claims is reserved to its members. *See* Pl.'s Reply Mem. in Support of Pl.'s MSJ ("Pl.'s Reply") [Dkt. #15] at 2–3; *see also* Second Decl. of Jed Dodd ("Second Dodd Decl.") [Dkt. #15-1].[7]

Because Amtrak presents a viable reading of the parties' agreement and has presented sufficient support to show it may, as a factual matter, prevail on its interpretation, it's contractual position can hardly be deemed "frivolous" or "obviously insubstantial." *Conrail*, 491 U.S. at 306; *see also Sheet Metal Workers Int'l Ass'n*, 2009 WL 3756440, at *3–4 (relying on sworn statements of carrier's employees as to contested factual issue in holding that dispute was minor under the RLA). Accordingly, the dispute is minor.[8] *See Bhd. of Maint. of Way Emps. Div., IBT v. BNSF Ry. Co.*, No. CIV 06-245 JCH/LFG, 2008 WL 5489360, at *7 (D.N.M. Sept. 17, 2008) (holding dispute over

---

[7]  To take one example, BMWED does not refute Amtrak's assertion that Amtrak trained and permitted Southeastern Pennsylvania Transportation Authority ("SEPTA") employees to perform flagging work on Amtrak property, including Amtrak property not leased to SEPTA. *See* Keefe Decl. ¶ 6. In response, BMWED simply states that "Amtrak has not shown that SEPTA employees actually performed flagging . . . and BMWED is not aware of any instance where employees of SEPTA performed flagging." Pl.'s Reply at 5.

[8]  In making this determination, the Court reiterates that it is not resolving, or issuing any opinion on, the merits of the parties' dispute. *ALPA*, 869 F.2d at 1521.

BMWED's alleged right to perform certain maintenance of way work under the applicable scope rule of the parties' collective bargaining agreement was minor); *see also CSX Transp., Inc. v. TCIU*, 480 F.3d 678, 684 (4th Cir. 2007) (holding disputes centering on alleged violations of the scope rule in the parties' agreement were "classic minor disputes . . . because they relate to the interpretation of a collective bargaining agreement").[9]

### 2. Arbitral Precedent

Numerous arbitration awards further confirm the plausibility of Amtrak's position. When confronted with questions regarding the reach of various scope rules in collective bargaining agreements between unions and other carriers under the RLA, arbitrators routinely recognize "that the Carrier is generally not held liable for contracting out where the work is totally unrelated to railroad operations, or where the work is undertaken at the sole expense of the other party and is for the ultimate benefit of others, or where the Carrier has no control over the work for reasons unrelated to having contracted out the work." Ex. C to the Second Decl. of Nikii L. McArthur ("Second McArthur Decl.") [Dkt. # 12-3] (*BMWED v. BNSF Railway Co.*, NRAB 3d Div., Awd. No. 35634 (2001)); *see also* Declaration of Nikii L. McArthur ("McArthur Decl.") [Dkt. #4-3] (collecting arbitration awards). That is, the Board has readily accepted the principle that Amtrak now advocates for: "subcontracting not performed at the Carrier's instigation, under its

---

[9] The Side Letter further supports Amtrak's interpretation by plausibly preserving only work performed "*for the Carrier*," within the sweep of the Scope Clause. That is, under the plain meaning of the term "for the Carrier"—which refers to Amtrak—the Side Letter could arguably be interpreted as not extending the Scope Rule to any work done for entities other than Amtrak, such as flagging work performed for third parties. *See* Def.'s Reply at 7.

control, at its expense or for its exclusive benefit" is generally not covered under scope

rules in collective bargaining agreements. *E.g.*, Ex. A to Second McArthur Decl.

(*BMWED v. BNSF Railway Co.*, NRAB 3d Div., Awd. No. 40501 (2010)). This

precedent confirms Amtrak's position is at least arguable.

As BMWED notes, the arbitration awards Amtrak relies on do not involve the

precise CBA at issue here. *See* Pl.'s MSJ at 23. Indeed, due to the brevity of the awards,

the precise contractual language at issue in each is omitted. *See generally* McArthur

Decl.; Second McArther Decl. As such, the Court is unaware of the exact degree of

similarity between the terms of the scope rules interpreted therein and those presently at

issue. This necessarily deprives the awards of some degree of persuasive power. But

BMWED confuses the Court's task in suggesting that the awards are therefore irrelevant.

*See* Pl.'s MSJ at 18–19.

The Court need not decide whether the arbitration awards are so analogous to the

case before us that they control the merits of the contract dispute. *See ALPA*, 869 F.2d at

1523 (holding that for courts to issue a "view on the merits" would "usurp[] the role of

the arbitrator in interpreting and applying the contract"). I need only assess the

plausibility of Amtrak's contractual argument and decide whether it veers so far off

course as to consist of mere frivolity. *Conrail*, 491 U.S. at 307. For this endeavor, a long

line of arbitral awards accepting the principle that now serves as the cornerstone of

Amtrak's argument is surely persuasive, even if those awards involved "other carriers,

other agreements, and another union," Pl.'s MSJ at 18. *See Conrail*, 491 U.S. at 310–11

(holding analysis of a collective bargaining agreement requires consideration of "the

common law of a particular industry" and describing arbitrators on the Board as "experts in the common law of the [] industry" (internal quotation marks and citations omitted)); *Bhd. of Maint. of Way Emps. Div.*, 2008 WL 5489360, at *5, *7 (holding dispute minor in part due to significant arbitral precedent supporting carrier's proposed contractual interpretation); *cf Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 641 (7th Cir. 1997) (stating courts must look to "parallel labor agreements, even those involving other parties" in interpreting the terms of collective bargaining agreements under the RLA).

In *Brotherhood of Maintenance of Way Employes Division, IBT v. BNSF Railway Co.*, for example, the court considered numerous arbitral awards in concluding that defendant's contractual argument was arguably justified and the dispute was therefore minor. 2008 WL 5489360, at *7. There, BMWED brought suit based on a similar argument to the one presented here, namely that the scope rules of the parties' collective bargaining agreement required the defendant carrier to use BMWED-represented employees to perform certain maintenance work "customarily and historically" performed by BMWED employees. *Id.* at *2. The carrier countered that no such right ensued under the agreement because the tracks over which BMWED claimed a right to work had been sold to a third party. *Id.* at *7. In concluding that the defendant carrier had "plausible contractual justifications," the court noted the "numerous arbitration awards [that] stand for the principle that when a carrier no longer owns the property to be maintained, maintenance and improvement work is not within the scope of rules governing the relationship between the union and the carrier." *Id.* at *5.

This reasoning is persuasive and applicable to the instant dispute. Amtrak presents numerous arbitration awards recognizing the principle that work not performed at the carrier's instigation, under its control, at its expense, or for its benefit generally falls outside the scope rule in collective bargaining agreements. Especially here, where the contractual language is silent on the work in question, this precedent affirms the plausibility of Amtrak's position. Accordingly, the parties' dispute is a minor one over which the Court lacks jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion to dismiss, DENIES plaintiff's motion for summary judgment, and DISMISSES the action in its entirety. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge